**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**

**CHARLES WASHINGTON,**

**Defendant.**

**Case No. 25-CR-075 (RBW)**

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. This memorandum, together with such evidence as may be presented at the sentencing hearing and the government's allocution at the time of sentencing, is intended to outline to the Court relevant matters relating to what the government believes would be an appropriate sentence in this case. In advance of sentencing, the government has reviewed the application of the advisory Sentencing Guidelines, the Presentence Report ("PSR") prepared by U.S. Probation Officer ("USPO") Ms. Gabriela Hernandez-Ramirez, *see* PSR ECF #39, and Ms. Hernandez-Ramirez's sentencing recommendation to the Court, the relevant factors set forth in 18 U.S.C. § 3553, and the defendant's plea for any impact on the appropriate sentence for the defendant in this matter. ***Based on that thorough and comprehensive review, the government respectfully requests that this Court sentence the defendant to the high-end sentence of the applicable Guidelines range of 46 months incarceration as outlined in the PSR.***

## I. INTRODUCTION

On November 12, 2025, the defendant plead guilty to Count One of the Indictment charging Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 USC § 922(g)(l). There is no plea agreement in this case.

## II. FACTUAL BACKGROUND

On March 12, 2025, at approximately 4:05 p.m., members of the Metropolitan Police Department's (MPD) Seventh District Special Missions Unit (SMU), who were in full uniform in fully marked police cruisers, responded to the 2800 block of Alabama Avenue Southeast, Washington, D.C. SMU officers had received information from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) regarding firearms inside a gray Kia Optima bearing Virginia registration plates TDS6535, which was parked in a Safeway parking lot.

As SMU members drove into the Safeway parking lot, they observed multiple individuals standing near the gray Kia sedan. As officers approached the vehicle, one of the individuals who was leaning on the vehicle, later identified as Charles WASHINGTON, took off in an unprovoked flight, running away from officers. Officers observed WASHINGTON run across multiple lanes of traffic toward the 2200 block of Town Center Drive, Southeast. Officers observed that WASHINGTON was grabbing at his waist and holding his waistband as he ran.

Officers observed WASHINGTON stop running and hunch over near a sewer drain before he appeared to throw an object into the sewer drain. After doing so, WASHINGTON continued to run away, but he was observed no longer holding his waistband. Shortly after WASHINGTON discarded the item in the drain, he tripped and was subsequently detained by officers. *See* Figures

1, 2, and 3 below.



*Figure 1: WASHINGTON holding his waistband as he runs*



*Figure 2: WASHINGTON Holding the Firearm (Circle Around Firearm)*




***Figure 3: WASHINGTON Discarding the Firearm in the Sewer Drain***

Once WASHINGTON was detained, officers returned to the sewer drain where WASHINGTON was observed discarding an item. Officers removed the manhole cover and observed a black firearm protruding through the leaves in the sewer. *See* Figures 4 and 5 below.



***Figure 4: Image of Sewer (Circle Around Firearm Protruding)***



***Figure 5: Close-up Image of Firearm Protruding***

MPD's Department of Forensic Sciences (DFS) responded to the location to assist in the recovery of the firearm from the sewer. Members of DFS were successful in recovering the firearm, which was identified as a privately made firearm (PMF). The recovered PMF was a Polymer80, INC, model PF940C frame with an attached Glock model 23, .40 caliber slide and barrel that displayed serial number BZNF135. The firearm was loaded with one (1) round of .40 caliber ammunition in the chamber and eleven (11) rounds of .40 caliber ammunition loaded in the thirteen (13) round magazine, which was seated in the firearm. *See* Figures 6 and 7 below.



***Figure 6: Image of the Firearm***




***Figure 7: Image of Ammunition***

While officers were pursuing WASHINGTON as he fled on foot, additional officers remained at the Kia sedan. MPD K9 officers responded to the scene and conducted an open-air

sniff of the vehicle, which yielded a positive result for the presence of smokeless gunpowder. Officers conducted a search of the vehicle, during which they found a clear plastic baggie containing a white rock-like substance in the driver's side door. Subsequently, the substance was sent to and tested by experts at the DEA Laboratory and determined to be 55.51 grams of cocaine base, a Schedule II controlled substance. The amount of cocaine base is more consistent with distribution amounts than personal use. *See* Figure 8 below.



***Figure 8: White Rock-Like Substance Recovered From Vehicle***

While officers were conducting the search of the vehicle, they observed a cellular device charging in the front center console of the vehicle. Officers noted that on the phone's lock screen was a picture of WASHINGTON with three other individuals. Additionally, officers found that WASHINGTON was in possession of keys to the Kia sedan when he was stopped. *See* Figure 9 below.



***Figure 9: Cellular Device in Vehicle (Circle Around Device)***

WASHINGTON was arrested in connection with his possession for the above-referenced firearm. Officers determined that WASHINGTON did not have a license to carry or own a firearm in Washington, D.C.

In 2011, WASHINGTON pled guilty to Carjacking, a felony in D.C. Superior Court case number 2010-CF3-021576. This offense is punishable by more than one year incarceration. WASHINGTON was sentenced to eighty-four (84) months incarceration and three (3) years supervised release. In 2018, WASHINGTON pled guilty to 18 U.S.C. § 922(g)(1), Unlawful Possession of a Firearm or Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in the United States District Court for the District of Maryland (case number PWG-8-17-CR-00555). WASHINGTON was sentenced to thirteen (13) months confinement and three (3) years supervised release. In 2021, WASHINGTON was found guilty of Unlawful Possession of a Firearm, a felony, in D.C. Superior Court case number 2019-CF2-014412. This offense is punishable by more than one year incarceration. WASHINGTON was sentenced to forty-two (42) months incarceration and three (3) years supervised release. As

such, WASHINGTON was aware that he had been previously convicted of multiple crimes that were punishable by more than one year.

There are no firearms or ammunition manufacturers or distributors in the District of Columbia; therefore, the firearm and ammunition in this case necessarily traveled in interstate commerce before it was recovered on the defendant in the District of Columbia.

## III. SENTENCING CALCULATION AND ANALYSIS

The guideline for 18 U.S.C. § 922(g)(l) offense is found in USSG §2K2.1 of the Guidelines. That section provides that if the defendant was a prohibited person at the time the defendant committed the instant offense (to wit: the defendant is a convicted felon in criminal cases: 2010-CF3-021576, 8:l 7CR00555-001, and 2019-CF2-014412), the base offense level is 14. *See* USSG §2K2.l(a)(6)(A), PSR ECF No. 39 at ¶21.

Moreover, officers found that the defendant was in possession of keys to a nearby Kia sedan vehicle when he was stopped. Officers used that key to search the vehicle. In the driver's side door, they found a clear plastic baggie containing 55.51 grams of cocaine base as tested and analyzed by an expert at the DEA Laboratory. The amount of cocaine base is more consistent with distribution amounts than personal use; therefore, increase by 4 levels. USSG §2K2.l(b)(7)(B). *Id.* at ¶22. Acceptance of Responsibility: The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by three levels. USSG §3El.l(a) & (b); PSR at ¶¶28-29. Also, defendant's Criminal History was determined to be V. *Id.* at ¶98.

Even though the Sentencing Guidelines are advisory, *United States v. Booker* provides that sentencing courts "must consult those Guidelines and take them into account when sentencing."

543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 590 U.S. 38, 49 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "'reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (*quoting Rita v. United States*, 551 U.S. 338, 347-50 (2007)); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation.

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment., backg'd. *Dorcely*, 454 F.3d at 375.

Notably, based on the facts of this matter, *inter alia*, the defendant's criminal history, release violations history, and previous adjudications are very significant and concerning - *see* PSR ECF No. 39 at ¶¶32-38 – and the fact that the defendant was on release status supervision for

another illegal firearm possession conviction as noted herein (*id*. at ¶38) - all demonstrates that this Court should sentence the defendant to the high-end sentence of the applicable guideline range. Accordingly, the government requests a sentence of 46 months' incarceration to be followed by 36 months' Supervised Release.

## IV. SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court shall consider in sentencing defendant Washington.

### (1) The nature and circumstances of the offense and the history and characteristics of the defendant.

#### (A) The nature and circumstances of the offense

Here, and as outlined more fully *infra*, the nature and circumstances of the offense counsel in favor of a significant term of imprisonment. The nature and circumstances surrounding the charged offense are very troubling. Indeed, the circumstances of the crimes here involved not only the unlawful possession of a loaded firearm, but that possession occurred while on another court's supervision status for another firearm conviction. This is alarming and dangerous for our community. The fact that the defendant was again charged and plead guilty to unlawfully possessing a loaded firearm is a serious crime that carries up to fifteen years in prison under § 924(a)(8).

The possession of a loaded firearm by convicted felon is extremely dangerous. The increase of urban shootings and violent crimes involving firearms has shown the negative impact that the unregulated flow of firearms can have on a community. Thus, as a threshold matter, the defendant's possession of a loaded handgun placed the community at risk. *See e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021)

(collecting cases in this district holding that unlawful firearm possession is dangerous to the public): *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2-3 (D.D.C. Sept. 21, 2020) (making the same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a firearm "has the great potential to escalate into violence"). Judges of this Court have warned against discounting the inherent danger associated with loaded firearms. *See, e.g.*, *Blackson*, 2023 WL 1778194, at *7-8 (noting that the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"), aff'd, *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023); *see also United State v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020) (holding that a defendant should be detained pretrial in part because "the firearm recovered from the defendant's person had a round already chambered, making the circumstances even more troubling"), aff'd (D.D.C. Nov. 5, 2020). Here, the firearm recovered had many of these troubling characteristics with one round of ammunition already chambered and ready to be fired and an additional 11 rounds in the magazine.

The defendant could not have possessed the firearm legally due to his status as a felon and therefore had an illicit source for the firearm, further demonstrating the potential dangerousness associated with the loaded firearm. Indeed, the government respectfully avers that the defendant is a significant danger to the community, and his criminal actions in this matter demonstrate that a high-end sentence of the applicable Guidelines range of 46 months incarceration to be followed by 36 months' Supervised Release, is the interest of justice and

would punish the defendant appropriately.

**(B) The history and characteristics of the defendant**

The defendant is a 34-year-old man who has a history of very significant adult convictions as outlined below and in the PSR.[1] *See Id.* ¶35-38.

---

[1] The defendant's convictions include the following:

- 11/12/2010 CT100728X - Prince George's Country, MD - False Statement to Officer - Confinement 6 months:

  According to the Statement of Probable Cause, on March 4, 2010, at approximately 11:45 p.m., officers responded to 5302 Kenmont Rd, Oxon Hill, Maryland 20745 for a report of a recovered carjacked vehicle which was occupied in front of this location. The vehicle carjacked in Washington, DC (Case #10-027-783), a Chevrolet Malibu bearing Virginia registration "DOGWALK", was located at that address. The aviation unit observed the defendant, Charles Washington, and another subject, running from the listed recovered carjacked vehicle. The defendant was later observed hiding in the backyard of 5319 Deal Dr., Oxon Hill, Maryland 20745 where he and the other subject were arrested. Victim 1 positively identified both the defendant and the other subject as the suspects who carjacked her in DC and stole the listed vehicle. *Id* at ¶35.

- 04/11/2011 2010-CF3-021576 (Washington, D.C.) - Carjacking - Confinement 84 Months:

  According to the Affidavit in Support of an Arrest Warrant, on March 4, 2010, at approximately 11:00 p.m., C-1 and C-2 reported that they were walking to C-1's car parked in the 2100 Block of 8th Street NW. They observed two black males walk past them. They got into the car at which time both suspects walked back to the passenger side of the car and produced a black colored handgun and stated, "Give me the keys and get out of the car." Both complainants got out and suspects got in the car and left the area. While complainants provided the report, On Star notified Prince George's County that the car was in the area of 5300 Deal Drive, Oxon Hill, Maryland and two suspects were stopped. PG County Air One had observed Defendant Washington hiding in the rear of 5319 Deal Drive, Oxon Hill, Maryland. An officer with his dog conducted an article search and where Defendant Washington was observed hiding, he recovered the car keys to the carjacked car. *Id* at ¶36.

- 06/13/2018 CR17-000555 (Greenbelt MD) - Felony Possession of Firearm and Ammunition - Incarceration 13 Months.

  According to the Offense Conduct from the presentence report prepared in this case, on July 16, 2017, at approximately 11:30 p.m., officers working for Prince George's County Police Department ("the officers") observed a car occupied by Defendant Charles

In making its current sentencing recommendation to the Court, the government has also reviewed the defendant's Personal and Family Data as outlined in the Final PSR, which outlined the defendant's relationship with his family and family history. *See Id.* ¶¶53-66.

Further, the government has reviewed the defendant's Mental and Emotional Health and Substance Abuse backgrounds as outlined in his PSR. *Id*. ¶¶72-84. Notably, regarding his substance abuse, the defendant stated that, ". . . he began consuming alcohol at the age of 13.

---

Washington, Jr. ("Washington") and Ernest Summers illegally drive through a stop sign. After observing the car drive through the stop sign, the officers conducted a lawful traffic stop of see the car. As the officers approached, they encountered Summers in the driver's seat and defendant Washington in the passenger seat. Summer's waist was covered with paper and envelopes. The officer could also a noticeable bulge in the center of Defendant Washington's waistband. When an officer asked Defendant Washington what the bulge was, Defendant Washington responded that it was a cellphone. When that officer patted down defendant Washington's clothing, he discovered in defendant Washington's waistband a Ruger model P95DC, 9-millimeter semiautomatic handgun bearing serial number 316-31319. That handgun was loaded with 13 rounds of ammunition (including one round of ammunition in the chamber. *Id* at ¶37.

- 06/21/2021 2019-CF2-014412 (Washington, D.C.) Unlawful Possession of a Firearm (Crime of Violence) Confinement 42 months & Carrying a Pistol Without a License Confinement 36 months, Possession of a Large Capacity Ammunition Feeding Device - Confinement 24 months.

  According to DC Superior Court records, on November 9, 2019, members of the MPD Gun Recovery Unit were in the 600 Block of Newton Place, NW due to numerous firearm recoveries from shootings in the area in recent weeks. Officers stepped out of the vehicle and the defendant, Charles Washington, separated himself from the group of individuals and immediately took unprovoked flight, and began to run through the alley. The officer that was directly behind the defendant observed what appeared to be a handgun in the defendant's right hand. The defendant was then observed tossing the firearm over the brick wall in the alley behind 3509 Georgia Avenue, NW.

  Once the defendant was stopped, officers observed a black and silver handgun on the other side of the alley wall, in the exact same area where he observed tossing the firearm. The firearm recovered appeared to be fully functional, designed to expel a projectile by the action of an explosive, had a barrel length of less than 12 inches and was capable of being fired by use of a single hand. Make: Smith & Wesson, Model: SD40VE, Caliber: 40, Serial Number: HFZ3675, Rounds O in chamber, 14 in magazine. *Id*. ¶38.

He indicated that he would drink hard liquors to the point of intoxication. He acknowledged that alcohol is the substance that has caused him the most problems, as it triggers aggressive behavior. He stated that intoxication was his method of coping with his problems. Concerning marijuana use, he disclosed that he consumed marijuana daily until his arrest for the current offense." *Id* at ¶79. Nevertheless, the defendant has had ample opportunities and court supervisions to change his repeated criminal conduct in our community. Sadly, the defendant has chosen not so.[2]

---

[2] Also, the United States has learned that the defendant has been indicted in Prince George's County, Maryland for Murder and other related offenses pursuant to a Superseding Indictment that is currently in warrant/Bench Warrant Status. It is important to note that the facts of that murder investigation and Indictment are outlined as follows:

FACTUAL SUMMARY

On Tuesday, October 3, 2023, at approximately 11:59 p.m. PGPD responded to 803 Irvington Street Oxon Hill, MD for reports of a shooting. Once on the scene, responding officers located two adult males suffering from gunshot wounds. Prince George's County Fire/EMS responded to the scene and transported both males to local hospitals.

Derrick Anthony GRAHAM (hereinafter GRAHAM) was transported to the University of Maryland, Capital Region Medical Center where, despite all life-saving efforts, he was pronounced deceased on October 4, 2023 at 1:51a.m. by Dr. Rao M.D. On Wednesday, October 4, 2023, Dr. Fernandez, M.D from the Office of the Chief Medical in Baltimore, performed the autopsy on GRAHAM. The death was determined to be a homicide caused by gunshot wound(s).

The surviving victim DeAngelo Everick MOORE (hereinafter MOORE), was transported to MedStar, Washington Hospital Center, where he listed in critical condition. On Thursday, October 5, 2023, MOORE, was pronounced deceased at 4:14p.m. by Dr. Koneru M.D. at Medstar Washington Hospital Center. On Saturday, October 7, 2023, Dr. Golden from the Office of the Chief Medical Examiner in the District of Columbia performed an autopsy on MOORE and determined that the death was a homicide caused by gunshot wound(s).

Homicide Detectives and Crimes Scene Investigators were notified and responded to the scene to take investigative responsibility. The scene was processed, and items of evidence were collected. This included a Ruger .45 caliber revolver, fired .380 caliber casings, and fired .40 caliber cartridge casings. Initial investigation revealed that GRAHAM and MOORE were both shot by unknown suspect(s) who fled the scene. Both the decedent and the victim's bodies were located in a grassy area approximately 30 yards from the fired shell casings in the parking lot. MOORE was wearing a black ski mask and had a revolver near him at the time his body was discovered.

On Wednesday, October 4, 2023, GRAHAM's cellphone, with the number **********,

**(C) The Need to Afford Adequate Deterrence to Criminal Conduct, and the Need to Protect the Public from Further Crimes of Defendant**

The Court must also consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct [and] to protect the public from further crimes of the defendant . . . ." 18 U.S.C. § 3553(a)(2)(B), (D). The United States respectfully submits that these factors

---

was recovered from the crime scene and placed into evidence. MOORE's cellphone, with the number ********, was recovered from the crime scene and placed into evidence. The cellphone logs in MOORE's recovered cellphone revealed that shortly after the time of the homicide, a contact in MOORE's cell phone repeatedly called from a telephone number of *******. The contact name attached to that phone number was saved in MOORE's phone as "*******."

On Monday, October 9, 2023, Witness 1, whose identity is known to detectives, contacted Detectives and stated that MOORE, was with his friend "******" on the night of the homicide, and that "******" was apparently present at the scene when the homicide occurred. Witness 1 indicated that he did not know the legal name of MOORE's friend nicknamed "******."

On Tuesday, October 10, 2023, Witness 2, whose identity is known to Detectives, contacted detectives and stated that Antonio JACKSON (hereinafter, JACKSON) was with MOORE, on the evening of the homicide. Witness 2 confirmed that JACKSON and MOORE were together on October 3, 2023, from approximately 8:00 p.m. until the homicide occurred at approximately 11:59 p.m. Witness 2 also confirmed to detectives that JACKSON is known by the nickname "*******," and that JACKSON had previously provided Witness 2 with a phone number for him of *********. Therefore, detectives know that the phone contact saved as "*******" in MOORE's cellphone with the phone number ********, which repeatedly called MOORE's phone after the shooting, is the same person identified as "******" by Witness 1, and identified as JACKSON by Witness 2.

Further investigation revealed that JACKSON, MOORE, and WASHINGTON met during the evening of October 3, 2023 and decided to target a random person for a robbery. JACKSON was tasked to be the get-away driver using his own vehicle. Upon their arrival at the location of incident, MOORE and WASHINGTON exited JACKSON's vehicle and flanked GRAHAM. WASHINGTON was armed with a Smith & Wesson .40 caliber black handgun with a laser mount. JACKSON exited the vehicle last. WASHINGTON picked GRAHAM as their target. WASHINGTON fired first without provocation; JACKSON fired after. MOORE was shot during the incident. JACKSON returned to his vehicle and entered the driver's side. WASHINGTON entered the back of JACKSON's vehicle. Both fled the scene towards Washington, D.C.

***On March 12, 2025, in the instant case, WASHINGTON was arrested in Washington, D.C. after police officers observed WASHINGTON discard a .40 caliber Polymer 80 handgun into a sewer drain. Officers recovered the handgun and it was determined to be a match to the .40 caliber casings recovered at the scene of this October 2, 2025 double homicide by the Firearms Examination Unit.***

justify a high-end sentence of the applicable guideline range of 46 months of incarceration to be followed by 36 months of Supervised Release.

Importantly, this Court is well aware of the impact that loaded firearms have had on the District of Columbia, and the need to deter that conduct. A sentence that provides both specific and general deterrence is especially important in this case because the defendant possessed a loaded firearm on a public street in our community. If our community is to have any hope of stemming the tide of illegal loaded firearms, the defendant must be punished accordingly.

**(D) The need to avoid unwarranted sentencing disparities among defendants with similar records**

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. As discussed *supra*, this Court should sentence the defendant to a significant high-end sentence of the applicable guideline range of 46 months of incarceration to be followed by 36 months' Supervised Release. Therefore, based on the facts and evidence in this matter, there would be no disparities among other defendants with similar records and factual

nexus. Indeed, the government's requested sentence is reasonable, as it strikes the balance between considering the defendant's background and the facts of this case.

Specifically, despite being given numerous opportunities by other judicial officers to not commit any additional criminal offenses, the defendant continued to reoffend and, in the instant case, acquired a loaded firearm and narcotics where citizens lived nearby. This behavior demonstrates that the defendant was ready, willing, and able to commit another crime against members of the community. *See United States v. Blackson*, 2023 WL 1778914, at *11 ("At the outset, it cannot be gainsaid that unlawful possession of a firearm that is unregistered and fully loaded, with extended capacity magazines, carried in a position of easy, quick access poses a significant danger to other persons and the community."); *United States v. Washington*, 907 F. Supp. 476, 486 (D.D.C. 1995) ("[P]ossession by a felon of a fully loaded semi-automatic pistol suggests that the defendant presents an extreme safety risk to the public."). Thus, the defendant is a danger to the community, and he should be sentenced accordingly for all the reasons stated herein.

## V. CONCLUSION

For the foregoing reasons, the United States recommends that this Court sentence defendant Washinton to a high-end sentence of 46 months' incarceration to be followed by 36 months' Supervised Release.

The government respectfully avers that its recommended sentence would therefore reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: */s/Emory V. Cole*
EMORY V. COLE
PA. Bar No. 49136
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Emory.Cole@usdoj.gov